**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DARRYL ORRIN BAKER,              )
                                 )
          Plaintiff              )
                                 )
     v.                          )     Civil Action No. 05-147E
                                 )
UNITED STATES OF AMERICA         )     JUDGE McLAUGHLIN
GOVERNMENT OFFICIALS AT          )
FCI-McKEAN, WARDEN, OFFICER      )     ELECTRONICALLY FILED
B. WESEMEN, MEDICAL DEPARTMENT   )
                                 )
          Defendants.            )

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS,**
**OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

AND NOW, come the Defendants, United States of America Government Officials at FCI-McKean, Warden, Officer B. Wesemen, Medical Department, by their attorneys, Mary Beth Buchanan, United States Attorney for the Western District of Pennsylvania, and Paul E. Skirtich, Assistant U.S. Attorney for said district, and pursuant to Rules 12(b)(1)(2) and/or (6) and 56 of the Fed. R. Civ. P., file this Memorandum of Law in Support of Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment. This pleading is filed subsequently to the Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, and should be read together.

**I.  PARTIES**

The Plaintiff, Darryl Orrin Baker, Register Number 19613-039, is a federal inmate incarcerated at the United States Penitentiary (USP), Lewisburg, Pennsylvania. On September 20,

1995, he was sentenced in the United States District Court for the Eastern District of Michigan to a 235-month term of imprisonment, with a five-year term of supervised release to follow for Distribution of Cocaine Base, among other violations of 21 U.S.C. § 841(a)(1).  Assuming he receives all Good Conduct Time available to him under 18 U.S.C. § 3624(b), his projected release date is July 2, 2012.  See **Document 1a**, Public Information Data for inmate Darryl Orrin Baker, Register Number 19613-039, attached to the Declaration of Joyce Horikawa.

Plaintiff has named the following as Defendants:

(1) United States of America;

(2) Government Officials at FCI McKean;

(3) Warden [at FCI McKean];

(4) Officer B. Wesemen; and

(5) Medical Department [at FCI McKean]

## II.    STATEMENT OF CASE

Plaintiff has filed the Complaint under the Federal Tort Claims Act, 28 U.S.C. § 2670, et seq. ("FTCA")and Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971) (hereinafter "Bivens").  He alleges that on February 27, 2004, at approximately 8:05 p.m., he was assaulted by two other inmates at FCI McKean in front of several other inmates in his cell.  Plaintiff alleges the housing unit officer was not present in the housing unit at the time of the assault.

He alleges that two days after the assault, staff became aware he was assaulted. He was taken to the Lieutenant's Office, and later, to the Health Services Unit (HSU). Plaintiff alleges the treating Physician's Assistant (PA) denied him medical attention and medication for pain and suffering. Plaintiff also alleges he was denied an examination by an eye doctor or eye specialist. He alleges he was thereafter placed in the Special Housing Unit (SHU). He contends he was denied medical attention while he was housed in the SHU. Plaintiff contends that as a result, he suffers future pain and suffering and future ailments, including: (1) his left eye will not look up as far as the right eye; (2) there is some scarring on the floor of the orbit with possible adhesions to the inferior rectus muscle; (3) orbital floor fracture; (4) orbital floor fracture with entrapment; (5) blow-out fracture; (6) he cannot look up with his left eye without experiencing a form of diplopia; (7) his left eye is off-centered; (8) he has pain in his left eye when he moves to the right and left; and (9) numbness in the left side of his face. Plaintiff seeks a trial, $20 million in tort damages, $20 million for personal liability against the individual Defendants, $20 million in punitive damages, $15 million for future pain and suffering, interest, and any other relief deemed just and fair. (See, generally, Plaintiff's Complaint).

### III.  **STATEMENT OF FACTS**

On September 12, 2002, Plaintiff was designated to FCI McKean, Pennsylvania.  See **Document 1a**, at p. 1.

On February 29, 2004, at approximately 9:15 p.m., a Correctional Officer observed Plaintiff lying in his assigned cell with a bed sheet covering his face.  The officer asked him a question, and he answered the Officer with the sheet over his face.  The Officer became suspicious and ordered Plaintiff to remove the sheet.  After Plaintiff complied, the Officer observed that his left eye and upper forehead had injuries that were consistent with an assault.  When asked how he sustained those injuries, Plaintiff replied that a dumbbell fell on him.  The Correctional Officer immediately notified the Operations Lieutenant.  See **Document 2a**, Szarowicz Memorandum dated February 29, 2004, attached to the Declaration of Monica Recktenwald.

At 9:30 a.m., Plaintiff was escorted to the Lieutenant's Office, after which he was escorted to the institutional hospital.  See **Document 2b**, Carlson Memorandum, dated February 29, 2004.

On February 29, 2004, at 9:50 a.m., Plaintiff was examined by a Physician's Assistant (PA).  Plaintiff reported face and eye pain associated with an assault by two inmates, with no loss of consciousness.  He also complained of minor pain, swelling, and

4

abrasions on his right chest, back, upper extremities, and both
hands.  He reported episodic nose bleeding during the 24 hours
following the assault.  He also reported resolving or decreasing
paresthesia (numbness) of his left face and teeth.  He denied
dizziness, hearing loss, vision loss, or loss of consciousness.
On examination, he was awake, conscious, and oriented.  He was in
moderate distress, ambulatory, and had a flat affect.  No blood
was observed from his ears.  His tympanic membranes were intact
without fluid or blood.  The left side of his face was mildly
tender with some ecchymosis (skin discoloration) and swelling.
No step-off deformity of his nose was observed.  His skin was
intact with much periorbital ecchymosis, edema, and tenderness.
His nasotracheal pyramid and nose tip were neutral with mild
ecchymosis on the left side.  A deviated nasal septum was
observed on the right side with bilateral mucosal edema, left
greater than right, with dried and fresh blood.  On the left side
of the nose, no visible rupture was observed.  Injuries to his
chest, back, and upper extremities were diagramed.  His cranial
nerves II-VIII were intact.  His pupils were equally reactive to
light and accommodation.  Conjunctivitis was observed in his left
eye.  He was assessed with periorbital soft tissue trauma,
ecchymosis, and edema without a fracture, left maxilla/zygoma
contusion without a fracture to his mouth, contusion with
abrasions (superficial) to his right chest and back, contusions,

sprain, and superficial abrasions to his right arm, and nose
bleeding and deviated nasal septum without fracture.  He was
prescribed Epinephrine to control and prevent nose bleeding.  He
was given instructions regarding use of the Epinephrine.  He was
given the Snelling visual eye examination, and he scored 20/25
bilaterally.  He was educated and counseled regarding trauma.  He
was told to return as needed.  See **Document 2c**, Inmate Injury
Assessment and Follow-Up Form, attached to the Declaration of
Monica Recktenwald.

At approximately 9:55 a.m., after the medical examination
was completed, Plaintiff was placed in the Special Housing Unit
(SHU), in Administrative Detention (AD) pending investigation
into the assault.  See **Document 3a**, Administrative Detention
Order, attached to the Declaration of William Baumgartel.

On February 29, 2004, at approximately 12:45 p.m., an inmate
reported to a Correctional Counselor that two nights prior,
Plaintiff went into the microwave room in the housing unit to use
one of the microwaves.  At that time, another inmate was using a
microwave oven, and was saving the other oven for a friend.  The
other inmate told Plaintiff he could not use the microwave that
was not being used.  The reporting inmate indicated that words
were exchanged between Plaintiff and the other inmate, and a
third inmate entered the microwave room.  The reporting inmate
stated the third inmate held Plaintiff down while the other

inmate beat Plaintiff.  The Counselor was also informed that the two inmates were intoxicated at the time they allegedly beat Plaintiff.  See **Document 2d**, McNinch Memorandum dated February 29, 2004, attached to the Declaration of Monica Recktenwald.

During an investigation, Plaintiff was interviewed regarding the incident.  He stated that on Friday, February 27, 2004, at approximately 8:30 p.m., he entered the microwave room in his housing unit.  While in the microwave room, he had an argument with another inmate over the use of a microwave.  Plaintiff stated the other inmate left the area and returned with another inmate.  Plaintiff stated the two inmates assaulted him.  See **Document 2e**, Bailey Memorandum dated February 29, 2004.

The inmate who Plaintiff alleged was engaged in the verbal argument prior to the assault was interviewed by investigating staff.  He denied any knowledge of a fight or assault in the housing unit.  This inmate also denied he was involved in any fight or assault of Plaintiff.  He stated he had not seen Plaintiff for several days.  Id., at p. 2.

The third inmate involved in the incident told investigating staff that Plaintiff and the other inmate were in a fight in the microwave room the previous Friday night.  He stated the two of them got into a fight over the use of a microwave oven, and when he saw the fight, he jumped in to break it up.  This inmate

claimed that he had nothing to do with the injuries sustained by Plaintiff. Id., at p. 2.

Plaintiff's medical records reflect the following:

On February 29, 2004, an injury assessment and follow-up form was completed by the Physician's Assistant (PA) indicating Plaintiff was injured during an assault by two inmates. The PA thoroughly examined Plaintiff and diagramed his injuries. It is notable that during this examination, Plaintiff had no complaints of double vision or blurred vision, and the PA did not indicate that Plaintiff's left eye was off-centered. The details of this examination are set forth infra, at pp. 4-3. See **Document 4a**, at p. 174, Medical Record of Darryl Orrin Baker, Reg. No. 19613-039, attached to the Declaration of Steven Brown.

While Plaintiff was in the SHU pending investigation into the incident, medical staff made rounds through the SHU twice each day. See **Document 5**, Declaration of Rodney Smith.

On March 9, 2004, at the request of an Associate Warden, a PA visited Plaintiff in the SHU to advise him of the SHU sick call procedures. During this visit, Plaintiff became verbally abusive and belligerent. He was told his behavior was not appropriate, and he was given another chance to discuss his health issues. He continued to be abusive in demeanor and language. The visit was ended. Plaintiff was advised to sign up for sick call if he needed to be seen. See **Document 4a**, at p. 43.

On March 11, 2004, the Medical Officer entered a notation
into Plaintiff's medical record indicating that earlier that day,
he received a written request from Plaintiff dated March 9, 2004,
in which Plaintiff indicated he was assaulted on February 27,
2004, and he was experiencing problems with his left eye.
Plaintiff indicated that during the assault, he suffered
contusions about his face, back, and arm.  He stated his left eye
was punched and was sore, but cleared up afterwards.  Plaintiff
stated that during the previous five days, the eye became sore
again with crusting of the lower lid, red with weeping and
redness.  He denied photophobia, with slight soreness when he
looked down.  On observation, Plaintiff looked well.  His pupils
were equal and reacted to light and accommodation.  He had full
extraocular movement in both eyes.  A fundoscopic visual
examination was within normal limits for both eyes.  The right
conjunctiva was not red, and the left conjunctiva was slightly
red.  An abrasion was observed at the lower lid of the left eye,
and his left eye was watering.  He denied recent injury or
trauma.  His vision acuity was 20/30 bilaterally, and flurosine
staining revealed no defect of the left cornea.  Plaintiff was
assessed with abraded lower lid of the left eye.  The doctor was
unsure how this happened and indicated his belief that the injury
was not related to the February 27, 2004 assault.  Plaintiff was
educated regarding use of medications.  He was prescribed

Sufacetamide Ophthalmic Solution, and an optometry consultation was ordered. Id., at pp. 40-41.

On March 25, 2004, a PA conducting sick call appointments in the SHU indicated that Plaintiff failed to report for a sick call appointment to check on his left eye due to his March 2, 2004 release from the SHU to the general population. It was noted that Plaintiff should follow-up with any medical needs at the Health Services Unit (HSU) and through general population sick call procedures. Id., at p. 38.

On March 31, 2004, Plaintiff was seen by the optometrist. It was noted that Plaintiff's left eye stopped during an upward gaze. He suspected entrapment of the left superior oblique muscle after the injury of February 27, 2004. He recommended an evaluation by an ophthalmologist. Upon receipt of the optometrist's evaluation, the Medical Officer contacted the contract ophthalmologist. The ophthalmologist recommended CT scans of the orbits including coronal views and an ophthalmology follow-up appointment one week after the CAT scan. The ophthalmologist's recommendations were forwarded to the Utilization Review Committee (URC). Id., at pp. 36, 143-144.

On April 1, 2004, Plaintiff was seen by the Medical Officer for a follow-up appointment. Plaintiff reported, "When I look up, I see double since the assault." The Medical Officer observed Plaintiff appeared generally fine. He noted Plaintiff

10

could not look up above the rest point with his left eye.
Lateral movements were okay.  He noted tenderness of the upper
aspect of the orbital rim of the left eye.  Plaintiff was
assessed with probable left superior orbital muscle entrapment.
Plaintiff was educated regarding upcoming plans for correction.
He was prescribed Ketoconazole.  Id., at p. 37.

CT scans of Plaintiff's brain and orbits conducted on
April 9, 2004, showed an old fracture at the floor of the left
orbit with some mucosal thickening that appeared to be chronic.
No obvious muscle entrapment was noted at that time; however, the
inferior rectus was very close to the ridge.  Id., at pp. 82-83.

On April 9, 2004, upon his return from the CAT scan
procedure, Plaintiff was seen by the Medical Officer.  It was
noted the CT scans of the orbits were conducted, and the results
were not available.  Plaintiff was educated that he probably had
entrapment of the extraocular muscle, and the Medical Officer
explained how it could have happened.  On observation, Plaintiff
appeared okay.  It was noted that he lacked the ability to look
up with his left eye.  He was assessed with probable extraocular
muscle entrapment.  Id., at p. 34.

On April 12, 2004, it was noted that Plaintiff did not
report to review the CAT scan results.  Id., at p. 29.

On April 13, 2004, the Medical Officer called the
ophthalmologist's office.  Another ophthalmologist from the

11

practice re-read the CAT scan and indicated that Plaintiff had an old fracture at the inferior rim.  It was noted the CAT scan showed an old fracture of the inferior rim.  The Medical Officer noted he would await the contract ophthalmologist's recommendation.  Id., at p. 35.

On April 15, 2004, Plaintiff was evaluated by the contract ophthalmologist.  It was noted that his vision was 20/100 in the right eye and 20/200 in the left eye.  The ophthalmologist stated this could be corrected to 20/20 with an eyeglass prescription.  On examination, Plaintiff's eyes were well-aligned straight ahead.  However, during upward gazing, the left eye did not elevate or look as far up as the right eye.  He did not see any signs that the left eye was protruding further out or recessed into the eye more so than the right.  The retina was normal.  The CAT scan suggested some scarring of the floor of the orbit with possible adhesions to the inferior rectus muscle.  He noted that typically, in ophthalmology, even with a fracture of the orbital floor, it was preferred to wait at least two weeks to see if it would heal on its own.  It was noted Plaintiff was about six to eight weeks post-trauma, and was complaining of symptoms.  Because he was well-aligned at near, the ophthalmologist determined it would be preferable to take a conservative approach.  He indicated it would be worthwhile to get a second opinion by an orbital plastic specialist.  Id., at p. 140.

On April 15, 2004, upon Plaintiff's return from the contract ophthalmologist's office, the Medical Officer had a brief talk with Plaintiff and indicated he would contact the contract ophthalmologist for an update. Id., at p. 32.

On April 15, 2004, the Medical Officer noted that he spoke with the contract ophthalmologist, who stated Plaintiff had a healed fracture with some entrapment of the inferior rectus. He recommended Plaintiff be rechecked in two months. He indicated the outcome was fairly good, in that his gaze was convergent in most portions. Id., at p. 30.

On April 15, 2004, the Medical Officer advised Plaintiff of the information provided by the contract ophthalmologist. The assessment was healing fracture of the left orbit, inferior rectus muscle entrapment, functional, outcome reasonably good. Plaintiff was educated regarding the need for eyeglasses and a follow-up plan. Id., at p. 30.

On April 21, 2004, the Medical Officer noted another ophthalmologist from the contract ophthalmologist's office left a message indicating he would see Plaintiff. The Medical Officer indicated he would arrange for this appointment for one to two weeks later. He noted that he spoke with Plaintiff to explain the plan. Id., at p. 31.

On April 30, 2004, Plaintiff was transported to the contract ophthalmologist's office for a second opinion. Id., at p. 31.

13

On May 3, 2004, it was noted that the second ophthalmologist reported Plaintiff was quite functional with some degree of impairment as is.  He recommended an ophthalmology follow-up in six weeks.  He stated if Plaintiff had diplopia while looking straight ahead, he would need a repair.  Id., at p. 28.

On May 6, 2004, Plaintiff was seen by the Medical Officer for a re-check of his left eye.  During an examination of the extraocular movements, Plaintiff reported he felt better.  He stated he experienced pain looking up and to the right.  He stated he felt like he was making progress.  On examination, the Medical Officer felt Plaintiff was doing much better with elevation of the left eye.  There was slight diplopia when he looked up to the right.  Plaintiff was assessed with improving function of the left inferior rectus and healing blow-out fracture of the left orbit.  He was educated regarding wearing glasses, and a follow-up with the second ophthalmologist was scheduled for six weeks.  Id., at p. 29.

On June 4, 2004, Plaintiff was checked by the Medical Officer.  He reported he still saw double when looking up and to the right side.  He complained of pain in his left upper eye and nasal area.  During an examination, it was noted his left eye appeared to be improving.  It was noted Plaintiff still complained of diplopia in certain situations.  He was assessed with diplopia, blowout fracture, and left inferior rectus

14

dysfunction.  He was educated regarding his condition.  He was told that follow-up appointments had been scheduled, and he would be placed on the call out.  Id., at p. 26.

On June 9, 2004, Plaintiff was seen by the second contract ophthalmologist.  It was noted that at five months after the injury, he still had entrapment.  He could not look up with his left eye without experiencing a form of diplopia that gave him extreme imbalance.  He told the ophthalmologist he did not think he could function that way.  The ophthalmologist noted his acuity was 20/20 in both eyes with glasses.  The ophthalmologist recommended repair of the blowout fracture to release the entrapment under general anaesthesia.  He explained to Plaintiff that one of the risks of this procedure was the risk that he may develop diplopia in down gaze.  The ophthalmologist could not guarantee this outcome would not result.  Id., at p. 142.

On June 16, 2004, the Medical Officer noted he reviewed the report from the second contract ophthalmologist.  The report was forwarded to the URC.  Id., at p. 27.

On July 1, 2004, Plaintiff was transferred from FCI McKean.  See **Document 1a**, at p. 1.

On July 7, 2004, during an intake screening at the Metropolitan Detention Center (MDC), Brooklyn, New York, it was noted Plaintiff had a history of orbital fracture and needed an ophthalmology follow-up.  Plaintiff was instructed to follow-up at sick call for further evaluation.  See **Document 4a**, at p. 18.

15

On August 12, 2004, Plaintiff was transferred from MDC Brooklyn to FCI Elkton, Ohio.  See **Document 1a**, at p. 1.

On August 13, 2004, he reported he had a terrible sore throat for three days with fever, chills, and aches.  It was noted he did not have a fever at the time he reported to the HSU. After an examination, he was assessed with tonsilitis.  He was prescribed Amoxicillin and Motrin.  He was instructed to gargle and rest, and to follow-up in sick call.  See **Document 4a**, at p. 12.

On September 20, 2004, Plaintiff complained of continued pain and diplopia in his left eye.  On examination of his eyes, mild decreased superior movement of his left eye was noted.  He did not have eyeglasses.  He indicated he experienced pain with lateral movement.  His medical consultations and CT scans were reviewed.  He was assessed with status-post left orbital fracture with impingement/entrapment.  A CAT scan of his orbits was ordered.  An ophthalmologist referral was forwarded to the URC to determine the need for surgery.  He was scheduled to see an optometrist.  Id., at p. 13.  On December 16, 2004, Plaintiff complained of continued pain in his left eye.  He asked when he would have the CAT scan and an appointment with an outside specialist.  He also had medical complaints not related to his eyes.  He was examined, and the CAT scan schedule was checked. He was assessed with history of left orbital fracture.  It was

16

noted he was on the schedule for a CAT scan, but it was cancelled due to fog and inclement weather.  It was noted he was rescheduled for a CAT scan.  He was educated, and it was noted that his eye had become a chronic situation, but was not urgent. Id., at pp. 8, 11.

On January 19, 2005, he was seen in the Chronic Care Clinic. He stated he had a history of diplopia, dizziness, headaches, and left eye muscle entrapment, secondary to an assault at FCI McKean.  It was noted he was transferred to FCI Elkton before he could have surgery on his orbit.  After an examination, he was assessed with diplopia, dizziness, and headaches.  It was noted that after receiving results from the CAT scan, a surgical referral could be forwarded to the URC.  Id., at pp. 8-9.

On March 28, 2005, a CAT scan was conducted.  His paranasal sinuses appeared clear.  There was some nasal septal deviation towards the left.  The left frontal sinus was hypoplastic.  The globes and the optic nerve appeared fairly symmetric.  There appeared to be a fracture involving the left orbital floor. Absence of bone was noted involving the posterior aspect of the orbital floor and lateral aspect.  The inferior rectus muscle extended to this defect but did not definitely appear to be entrapped.  Minimal left maxillary sinus mucosal thickening was present.  The radiologist suspected this was not an acute fracture.  He saw minimal, if any, soft tissue swelling.  An

artifact from dental hardware limited his evaluation slightly. The uncinate process appeared intact bilaterally.  Osteomeatal units appeared to be intact.  The axial images indicated questionable, possibly healed fracture involving the left lateral orbital wall.  The impression of the radiologist was bony defect involving the posterior lateral aspect of the left orbital floor. He suspected this represented an area of previous fracture.  A small amount of orbital fat extended into this area.  The left inferior rectus muscle extended to this defect but not through the defect.  It did not appear to be entrapped.  There was minimal mucosal thickening of the left maxillary sinuses.  The remainder of the paranasal sinuses appeared clear.  No air fluid levels were identified.  The left frontal sinus was hypoplastic. Id., at p. 85.

On April 6, 2005, Plaintiff was seen in the Chronic Care Clinic at FCI Elkton.  He complained of pain in the left eye when he looked up or to the side.  He also complained of some numbness to the left side of the face.  He denied dizziness or drooling. He was examined.  He was assessed with diplopia, history of orbit fracture, and folliculitis.  He was educated about the care of his skin.  It was noted that the institution was awaiting a CAT scan and review of the URC for a surgical referral.  Id., at pp. 6-7.

On May 6, 2005, Plaintiff asked about the plan of action in regards to the left orbit fracture.  He stated he had pain in the

left eye.  After an examination and review of previous records,
he was assessed with history of orbit fracture and folliculitis.
He was scheduled to be seen by the Clinical Director.  Id., at
p. 4.

On May 18, 2005, he was seen by the Clinical Director
regarding the CAT scan of his left eye.  He stated he was still
having gaze problems and pain.  His vision was stable.  He was
assessed with left orbital fracture with mild entrapment of the
left inferior rectus muscle.  An ophthalmology/surgical
consultation referral was forwarded to the URC with the CAT scan.
Id., at p. 5.

On July 6, 2005, Plaintiff was seen in the Chronic Care
Clinic.  He complained of left eye pain.  He stated he felt pain
when looking up and also some swelling of the upper lid of the
right eye.  He also complained of allergy symptoms for two weeks.
On examination, he was alert and oriented.  No redness was
observed at his right eye.  His pupil was round and reactive.
Mild swelling of the upper lid was observed.  No swelling or
redness of the conjunctiva was observed at the left eye.
Tenderness was evident at the medial side of the upper side of
the orbit.  He was assessed with history of orbit fracture,
diplopia, and allergy.  He was educated regarding the URC's
decision to send him to the ophthalmologist for a surgical
consultation.  He was also told to purchase allergy pills at the
commissary.  Id., at p. 5.

On August 11, 2005, Plaintiff was scheduled to see the contract ophthalmologist for a surgical consultation. However, the appointment had to be cancelled because he refused to permit staff to apply handcuffs to his wrists in order for officers to transport him to the ophthalmologist's office. It was noted he continued to have a decrease in vision. He complained of pain in his left eye. He complained of diplopia when reading. On examination, his visual acuity was 20/25 in his left eye and 20/20 in his left eye. The eye fundoscopic examination was negative. He had a slight decreased lateral range of motion. He was assessed with history of left orbit fracture, no entrapment on examination. Plaintiff refused to sign the medical treatment refusal form. He was offered pain medications, and he refused them. He stated Motrin and Naprosen were no help. He had good vision acuity. It was noted that his refusal to submit to standard cuffing procedures resulted in the cancellation of the ophthalmology appointment. He was told that if he needed pain medication, he should report to sick call. Id., at p. 2.

## IV. **VENUE**

### A. **Bivens**

Venue in a Bivens action is governed by the provisions of 28 U.S.C. § 1391(b), which requires that the action be brought in the district in which all defendants reside or in which the claim arose. In the instant case, the claim arose in the territorial

20

jurisdiction of the United States District Court for the Western District of Pennsylvania.  Therefore, venue is proper.

### B.  **FTCA**

Venue of civil actions filed under the FTCA is governed by 28 U.S.C. § 1402(b).  This statute provides that venue is proper only in the judicial district where the plaintiff resides or where the act or omission complained of occurred.  28 U.S.C. § 1402(b).

In this civil action, all of the acts and/or omissions alleged in the Complaint took place at the Federal Correctional Institution (FCI) McKean, Pennsylvania, which is located within the territorial boundaries of the United States District Court for the Western District of Pennsylvania.  Therefore, venue is proper.

### V.  **PERSONAL JURISDICTION**

### A.  **Bivens**

To obtain in personam jurisdiction over defendants in a civil action, a court must have jurisdiction by the fact that either the defendant is a resident of the state in which the court is located or have sufficient minimum contacts within the state in which the court is located to permit the court to exercise its jurisdiction.  International Shoe v. Washington, 326 U.S. 310 (1945).  Also, "[b]efore a federal court may exercise personal jurisdiction over a defendant, the procedural

requirement of service of summons must be satisfied." <u>Omni Capital International v. Rudolph Wolff & Co.</u>, 484 U.S. 97 (1987). Accordingly, unless a defendant voluntarily makes an appearance or otherwise waives the lack of personal jurisdiction, personal jurisdiction must be acquired through proper service of process.

In the instant case, both Defendant Wesemen and Defendant Sherman were residents of the state of Pennsylvania at the time of the alleged incident in question.  Both Defendants were personally served with a Complaint and Summons in this case. Therefore, the Court has personal jurisdiction over these Defendants.

## VI.   <u>EXHAUSTION OF ADMINISTRATIVE REMEDIES</u>

### A.   <u>Bivens</u>

Plaintiff has **not** exhausted his available administrative remedies regarding any issue raised in this civil action.  <u>See</u> **Document 1**, Declaration of Joyce Horikawa.

### B.   <u>FTCA</u>

Plaintiff has exhausted his administrative tort remedies under the Federal Tort Claims Act, 28 U.S.C. § 2672.  <u>See</u> **Document 1b**, Administrative Tort Claim, Case Number TRT-NER-2004-03801, attached to the Declaration of Joyce Horikawa.  <u>See</u> <u>also</u>, **Document 1c**, Memorandum denying Administrative Tort Claim Number TRT-NER-2004-03801, attached to the Declaration of Joyce Horikawa; <u>See</u> <u>also</u>, **Document 1d**, Acknowledgment of Receipt Denial of Tort Claim, attached to Declaration of Joyce Horikawa.

## VII.  <u>LEGAL ARGUMENTS</u>

<u>            BIVENS</u>:

    A.  <u>Defendants Sherman and Weseman
Should Be Dismissed From This
Lawsuit, Because Petitioner's
Failure to Exhaust His
Administrative Remedies Is a
Procedural Bar to the Filing of a
Civil Action Regarding Prison
Conditions Under the PLRA</u>.

Plaintiff has not exhausted his available administrative remedies regarding an issue raised in this civil action.  <u>See</u> **Document 1**, Declaration of Joyce Horikawa.  Therefore, all claims raised pursuant to <u>Bivens</u> should be dismissed.  <u>Porter v. Nussle</u>, 122 S.Ct. 983, 2002 WL 261683 (2002); <u>Booth v. Churner</u>, 121 S.Ct. 1819, 1824 (2001).

The Prison Litigation Reform Act of 1995, as amended 42 U.S.C. 1997e (a) (PLRA), requires a prisoner to exhaust "such administrative remedies as are available" before suing over prison conditions.  The statute provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or an other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e.

In <u>Booth v. Churner</u>, <u>supra</u>, the United States Supreme Court held that under the PLRA, an inmate must complete any prison administrative remedy process capable of addressing the inmate's

complaint and providing some form of relief before seeking adjudication on issues involving prison conditions.  Booth v. Churner, 121 S.Ct. 1819 (2001); Neal v. Goord, 267 F.3d 116 (2d Cir. 2001).  See Booth v. Churner, 206 F.3d 289 (3d Cir. 2000) (PLRA requires exhaustion); Nyhuis v. Reno, 204 F.3d 65, 78(3d Cir. 2000)(PLRA makes exhaustion mandatory in all cases); Alexander v. Hawk, 159 F.3d 1321(11th Cir. 1998)(futile and inadequate nature of administrative remedy did not preclude mandatory exhaustion requirement of the PLRA).

In order to exhaust all process under the administrative remedy procedure for inmates, an inmate must first attempt to informally resolve the dispute with institution staff.  28 C.F.R. § 542.13.  If informal resolution efforts fail, the inmate may raise his or her complaint to the Warden of the institution in which he or she is confined, within 20 calendar days of the date that the basis of the complaint occurred.  28 C.F.R. § 542.14. If the Warden denies the administrative remedy request, the inmate may file an appeal with the Regional Director within 20 calendar days of the date of the Warden's response.  28 C.F.R. § 542.15.  If the Regional Director denies the appeal, the inmate may appeal that decision to the General Counsel of the Federal Bureau of Prisons within 30 calendar days from the date of the Regional Director's response.  See 28 C.F.R. § 542.15.  The administrative remedy process is not considered to be "exhausted"

24

until an inmate's final appeal is denied by the Bureau of Prisons General Counsel.

In the ordinary course of business, computerized indexes of all administrative requests and appeals filed by inmates are maintained in the Bureau of Prisons computerized data base so that rapid verification may be made as to whether an inmate has exhausted the administrative remedy process on a particular issue.  Following a search of the indexes of all administrative remedies filed by Plaintiff, it was determined that he had not exhausted his available administrative remedies on any issue raised in this civil action.  <u>See</u> **Document 1**.

Therefore, because Plaintiff failed to exhaust his available administrative remedies on any issue raised in this civil action, all claims alleged pursuant to <u>Bivens</u>, should be dismissed from this civil action.

    B.   **<u>Defendant Sherman, as a Supervisory Official, May Not Be Held Personally Liable Under the Theory of *Respondeat Superior*</u>**.

Plaintiff alleges he was assaulted by his cell mate in his cell and later subjected to inadequate medical treatment for injuries sustained in the assault.  Absent from this complaint is any allegation that Defendant Sherman personally violated Plaintiff's constitutional rights.

25

To the extent the complaint can be read to imply that Defendant Sherman had some role in the alleged violation of Plaintiff's constitutional rights by virtue of his supervisory position, it is well settled that the doctrine of respondeat superior cannot form the basis of a Bivens claim. Rizzo v. Goode, 423 U.S. 362, 371 (1976); Wright v. Smith, 21 F.3d 496 (2d Cir. 1994); Cameron v. Thornburgh, 983 F.2d 253 (D.C. Cir 1993); Noll v. Petrovsky, 828 F.2d 461 (8th Cir. 1987), cert. denied, 484 U.S. 1014 (1988); Farmer v. Carlson, 685 F. Supp. 1335, 1338 (M.D.Pa. 1988). Cf. Durmer v. O'Carroll, 991 F.2d 64, 69 n.14 (3d Cir. 1993).

In a Bivens action, the Plaintiff must plead and later prove that some affirmative act or omission was committed by each individual defendant to submit him/her to personal liability for the actions of another person. Brown v. Grabowski, 922 F.2d 1097 (3d Cir. 1990), cert. denied, 111 S.Ct. 2827 (1991). Unless a plaintiff pleads an affirmative link between the supervisor's personal participation, his/her exercise of control or direction or his/her failure to supervise, a superior cannot be held liable for the acts of a subordinate in a civil rights action. Baker v. Monroe Township, 50 F.3d 1186, 1190-91 (3d Cir. 1995); Haynesworth v. Miller, 820 F.2d 1245 (D.C. Cir. 1987). See Coleman v. Kaye, 87 F.3d 1491, 1507 (3d Cir. 1996) (supervisory liability will lie only where defendant "had actual knowledge of

26

discriminatory conduct and acquiesced in it", <u>cert</u>. <u>denied</u>, 519 U.S. 1084, 117 S.Ct 754, 136 L.Ed 2d 691 (1997); <u>Andrews v. City of Phila.</u>, 895 F.2d 1469, 1478 (3d Cir. 1990); <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir. 1988). See also, <u>Moffitt v. Town of Brookfield</u>, 950 F.2d 880, 885 (2d Cir. 1991).

In the instant action, Plaintiff fails to allege upon what basis Defendant Sherman was directly responsible for unconstitutional acts of others. Therefore, because <u>respondeat superior</u> cannot be used to impute personal liability on supervisory officials in civil rights claims, this claim should be dismissed as to Defendant Sherman.

       **C.**   **<u>Defendants Weseman and Sherman Are Entitled to Dismissal on the Basis of Qualified Immunity Because the Allegations of the Complaint Do Not Amount to the Violation of a Clearly Established Constitutional Right</u>.**

Defendants Weseman and Sherman are entitled to dismissal from suit on the basis of qualified immunity. A federal government employee is generally entitled to immunity from suit for personal damages if his or her conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). <u>See</u> <u>Siegart v. Gilley</u>, 111 S.Ct. 1789 (1991); <u>Anderson v. Creighton</u>, 483 U.S. 635 (1987); <u>Mitchell v. Forsyth</u>, 472 U.S. 511 (1985); <u>Davis v. Scherer</u>, 468 U.S. 183, 197

(1984).  The qualified immunity defense in this context is "an immunity from suit rather than a mere defense from liability." Mitchell v. Forsyth, 472 U.S. at 526.  In recognition of this, the Supreme Court has repeatedly stressed the desirability to resolve the qualified immunity issues at the earliest stage of litigation.  Hunter v. Bryant, 112 S.Ct. 534, 536 (1991); Anderson v. Creighton, supra;  Mitchell v. Forsyth, supra.

Once the individual defendants raise qualified immunity, courts must resolve two issues:  1) whether a constitutional right would have been violated on the facts alleged; and assuming the violation is established (from the pleadings), 2) whether the right alleged to have been violated  was clearly established. Saucier v. Katz, 121  S.Ct. 2151, 2001 WL 672265 (2001).

In Saucier, supra, the Supreme Court held that in a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence.  Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive.  Saucier v. Katz, 121 U.S. at 2155.

The specific qualified immunity inquiry is two-fold:  First, taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated

28

a constitutional right?  If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next sequential step is to ask whether the right was clearly established. Saucier, 121 U.S. at 2155

The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  Saucier v. Katz, 121 U.S. at 2156.  See Wilson v. Layne, 526 U.S. 603, 615 (1999).

An analysis of Plaintiff's claims against Defendant Sherman reveals Plaintiff failed to state a constitutional violation, because the complaint does not articulate what actions he took to violate Plaintiff's constitutional rights.  Therefore, all claims against Defendant Sherman should be dismissed from this case on the basis of qualified immunity.

Defendant Weseman should also be deemed qualifiedly immune. Plaintiff contends that Defendant Weseman violated his constitutional rights because he was not present in the Unit at the time of the alleged assault.  Although it is not contested that Plaintiff was injured in an assault, the applicable constitutional standard is deliberate indifference.  Farmer v.

29

Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977 128 L.Ed.2d 811 (1994).  In Farmer, supra, the Supreme Court held that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Farmer, 511 U.S. 837, 114 S.Ct. 1979.  Thus, an act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, but an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot be condemned as the infliction of punishment.  Farmer, 511 U.S. at 837-838, 114 S.Ct. 1979.

In this case, Plaintiff fails to allege that prior to the assault, Defendant Weseman had any reason to know Plaintiff was in danger of being assaulted.  Plaintiff also fails to state that during the assault, Officer Weseman had reason to know Plaintiff was being assaulted.  Finally, Plaintiff fails to allege how, after the assault, Officer Weseman had reason to know he was assaulted.  Although Plaintiff speculates Defendant Weseman may have been away from the unit, smoking, snacking or sleeping, none of these allegations rise to the level of a constitutional violation against Plaintiff.

Even assuming _arguendo_ that the complaint could be interpreted to sufficiently state Defendant Weseman and/or Defendant Sherman committed unconstitutional acts, Plaintiff has failed to articulate how these constitutional rights were clearly established. _Anderson v. Creighton_, 483 U.S. 635, 640 (1987).

Accordingly, under the facts as alleged in the complaint, each of the named defendants are entitled to qualified immunity, and should be dismissed from this lawsuit.

>    **D.     Defendants Sherman and Weseman
>            Should Be Dismissed From This
>            Lawsuit, Because Plaintiff Has
>            Failed to Allege His Eighth
>            Amendment Rights Were Violated**.

Plaintiff alleges that the prison staff negligently failed to protect him from an assault by other inmates, and he further alleges that he was provided with negligent medical treatment. Because mere negligence does not rise to the level of a constitutional violation under the Eighth Amendment, all _Bivens_ causes of action should be dismissed from this civil action.

It is well-established that not every injury suffered by one prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety. _Farmer v. Brennan_, 511 U.S. 825, 835, 114 S.Ct. 1970, 1977. Case law holds that a prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be objectively, "sufficiently serious."

_Farmer_, 511 U.S. at 834, 114 S.Ct. at 1977 (_quoting_ _Wilson v._
_Seiter_, 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271
(1991)).  In cases based on a failure to prevent harm, the inmate
must show that he was incarcerated under conditions posing a
substantial risk of serious harm.  _Farmer_, 511 U.S. 834, 114,
S.Ct. 1977 (_citing_ _Helling v. McKinney_, 509 U.S. 25, 35, 113
S.Ct. 2475, 2481, 125 L.Ed.2d 271 (1991).  Second, to violate the
Eighth Amendment, a prison official must have a sufficiently
culpable state of mind.  _Farmer_, 511 U.S. at 834, 114 S.Ct. at
1977; _Helling_, 509 U.S. at 35, 113 S.Ct. at 2481.  For Eighth
Amendment purposes, the state of mind must be one of "deliberate
indifference" to inmate health or safety.  _Farmer_, 511 U.S. at
834, 114 S.Ct. at 1977; _Wilson_, 501 U.S. at 302-303, 111 S.Ct. at
2326.  In _Farmer_, _supra_, the Supreme Court determined that
"deliberate indifference" is a subjective standard, and that a
prison official may be held liable under the Eighth Amendment for
denying humane conditions of confinement only if he/she knows
that an inmate faces a substantial risk of serious harm and
disregards that risk by failing to take reasonable measures to
abate it.  _Farmer_, 511 U.S. at 847, 114 S.Ct. at 1984.

Plaintiff's allegations are insufficient to establish either
of the two prongs.  With respect to the first prong, the
complaint fails to allege that at the time of the assault, either
Defendant Sherman or Defendant Weseman had reason to believe

32

Plaintiff was being housed under conditions that posed a substantial risk of serious harm to him.

Plaintiff's allegations regarding medical care fail to amount to an Eighth Amendment violation, because mere negligence does not amount to a constitutional violation. The law is clear that medical malpractice is insufficient to present a constitutional violation. See Estelle, 429 U.S. at 106; Durmer, 991 F.2d at 67; Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)(negligent medial treatment is not actionable under the Eighth Amendment); Unterberg v. Correctional Medial Systems, Inc., 799 F.Supp. 490, 497 (E.D.Pa. 1992)(medial malpractice is not deliberate indifference).

Therefore, because Plaintiff's Eighth Amendment rights were not violated, Defendants Weseman and Shermen should be dismissed from this civil action.

      **E.**  **The Failure to Protect Allegation Should Be Dismissed for Lack of Subject Matter Jurisdiction Because the United States Has Not Waived Sovereign Immunity in Matter Involving the Discretionary Function of Government Actors**.

Plaintiff alleges FCI McKean staff failed to prevent the assault in which Plaintiff was injured about his face and upper body. He broadly argues that the assault occurred because of the negligence of the United Sates in its operation and management of FCI McKean. Specifically, he contends that the United States

failed to take reasonable measures to protect inmates, because the staff member assigned to the inmate either did not prevent the assault or failed to stop the fight promptly. Thus, Plaintiff seems to posit two arguments: (1) FCI McKean failed to post sufficient staff in the housing units, and (2) staff at FCI McKean failed to separate him from his assailants prior to the assault.

Because both of these issues are governed by the discretion afforded to government workers, this case falls within the discretionary function exception to sovereign immunity. As such, it should be dismissed for lack of subject matter jurisdiction.

The FTCA waives the federal government's sovereign immunity in suits involving "personal injury...caused by the negligent or wrongful act or omission of any employee of the Government ... under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346 (b)(1). This waiver of sovereign immunity, however, is subject to a number of statutory exceptions, including the "discretionary function exception." See 28 U.S.C. § 2680(a). 28 U.S.C. § 2680(a) provides:

> The provisions of this chapter and section 1346(b) of this title shall not apply to -
>
> a. Any claim based upon an act or omission of an employee of the Government exercising

> due care, in the execution of a statute or
> regulation, whether or not such statute or
> regulation be valid, or based upon the
> exercise or performance or the failure to
> exercise or perform a discretionary function
> or duty on the part of a federal agency or an
> employee of the Government, whether or not
> the discretion involved be abused.

28 U.S.C. Section 2680(a).

The purpose of the exception is to shield administrative decisions involving an element of judgment from judicial second-guessing. United States v. Gaubert, 113 L. Ed. 2d 335, 346-48 (1991); Berkovitz v. United States, supra; United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 104 S. Ct. 2755, 81 L. Ed. 2d 660 (1984).

To determine whether a government employee's conduct is protected under the discretionary function exception, a court must apply a two prong test, commonly referred to as the Berkovitz-Gaubert test. See United States v. Gaubert, 499 U.S. 315 (1991); Berkovitz v. United States, 486 U.S. 531 (1988). Under this test, a court must first determine whether the challenged action involved an element of judgment or choice. See Gaubert, 499 U.S. at 328. This includes "day-to-day" management decisions. Fazi v. United States, 935 F.2d 535, 538 (2d Cir. 1991)(citing Gaubert, 499 U.S. at 328). Where an act is specifically mandated by statute or regulation and does not provide for any employee discretion, the challenged act is not

35

entitled to immunity.  See Fazi, 935 F.2d at 538 (*citing* Berkovitz, 486 U.S. 536).

If the challenged act satisfies the first requirement, a court must then determine whether the employee's judgment was "based on considerations of public policy."  Gaubert, 499 U.S. at 323 (*quoting* Berkovitz, 486 U.S. at 537).  If a regulation gives an employee discretion, "the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation" is inextricably intertwined with the policy considerations which lead to the creation of the regulation.  Id. at 324.  Thus, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion."

The policy and practice of agencies with respect to the design, maintenance and construction of their facilities frequently implicates the types of social, economic and political considerations that the Supreme Court has placed beyond the reach of the FTCA.  Gaubert v. United States, 111 S.Ct. 1267 (1991).  The design and operation of a federal prison involves a wide range of social and economic considerations.  Social concerns and considerations for a prison are markedly different from concerns in operating any other organization.  Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 129 (1977).  The Supreme Court has repeatedly noted that broad deference is to be afforded to the discretion exercised by prison administrators in

36

adopting and executing policies and practices which address the day-to-day problems in operating a corrections facility.  E.g., Thornburgh v. Abbott, 109 S.Ct. 1874, 1879 (1989); Turner v. Safley, 107 S.Ct. 2254, 2259 (1987); Bell v. Wolfish, 441 U.S. 520, 547 91979); Pell v. Procunier, 417 U.S. 817, 827 (1974).  These decisions necessarily involve balancing limited prison resources with the overriding concern of institution security.  Turner v Safley, 107 S.Ct. at 2262.

     The duty of care owed by the Bureau of Prisons to the inmate population is set forth at 18 U.S.C. § 4042.  18 U.S.C. § 4042 (a)(2)-(3) states, in pertinent part, the BOP must provide "suitable quarters and provide for the safekeeping, care, and subsistence of all [federal inmates]."  "While it is true that the statute sets forth a mandatory duty of care, it does not, however, direct the manner by which the BOP must fulfill this duty.  The statute sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates."  Calderon v. United States, 123 F.3d 947, 950 (7th Cir. 1997).  The statute assesses only the general responsibilities of BOP employees to ensure the safekeeping, care, and protection of inmates.  The absence of specific guidelines of appropriate conduct by BOP officials in administering these duties, therefore, leaves judgment or choice to BOP officials.

Plaintiff cites no statutes, regulations or BOP policies that remove the discretion from prison administrators in determining staffing duties and patterns within housing units or determining which inmates to place in the same housing units in general population.

The inquiry as to whether the discretionary function exception is applicable does not end simply with a finding that a discretionary function is involved.  The discretionary conduct must also be of the sort that the discretionary function was designed to protect – "based on considerations of public policy." The existence of a regulation pertaining to the proper conduct of BOP officials creates a strong presumption that the judgment involved is "based on considerations of public policy." Moreover, the very nature of the conduct regulated by the statute – the care and protection of inmates – involves public policy considerations in balancing inmates' rights within their housing units with general concerns of prison security,  See Calderon, 123 F.3d at 951 ("[B]alancing the need to provide inmate security with the rights of the inmates to circulate and socialize within the prison involves considerations based upon public policy.")(citing Bell v. Wolfish, 441 U.S. 520, 547-48, 99 S.Ct. 1861 (1979)).

The very purpose of the discretionary function exception, to prevent "second-guess[ing]" of administrative discretionary

functions, would be defeated if such tort actions under the FTCA were permitted to proceed. See Bailor v. Salvation Army, 51 F.3d 671, 685 (7th Cir. 1985)("If it is determined that the actions of the Bureau of Prisons involved discretion, the discretionary function will serve to protect the government from suit, even if the Bureau of Prisons abused its discretion or was negligent in the performance of its discretionary functions." (*citing* Hylin v. United States, 755 F.2d 551, 553 (7th Cir. 1985)).

18 U.S.C. § 4042 vests the BOP with the general duty to protect inmates in its custody. There is no statute or regulation requiring prisons to post officers in each inmate room or in common areas within each housing unit. Nor is there a statute or regulation requiring specific inmate housing assignments. At FCI McKean, during the time in question, one correctional officer was assigned to each side of an inmate housing unit. Each side of a housing unit holds approximately 150-160 inmates. See **Document 6**, Declaration of James F. Sherman. The correctional officer assigned to Plaintiff's side of the housing unit was responsible for monitoring that side of the housing unit and for supervising all inmates assigned to that unit. Among the monitoring and supervision duties was the requirement that the officer assigned to Plaintiff's side of the housing unit supervise inmate movement into the housing unit during the final institutional movement. See **Document 6** and

**Document 7,** Declaration of Brian Weseman.  Because FCI McKean assigned one correctional officer to each side of each inmate housing unit, and because FCI McKean required each housing officer to supervise inmate ingress during the final inmate movement at 8:30 pm each night, it was a discretionary matter left to the Warden and Unit Officer to determine the priority of duties within the housing unit at a given time.  See **Document 6, Document 7.**

According to Plaintiff's administrative tort claim and the investigation into this incident, the assault took place on February 27, 2004, at FCI McKean in the microwave room of housing unit AA at approximately 8:30 pm.  See **Document 1b,** at pp. 1-3. The determination as to where best to post officers throughout the housing units and what duties to assign to those officers, was and continues to be made by the Warden under the advice of correctional specialists and executive staff, based upon the security needs of the institution and the effective use of limited resources.  See **Document 6.**

Once a particular function is found to be discretionary, a negligence claim will fail, even if the Bureau of Prisons abused its discretion or was negligent in the performance of its discretionary functions.  Bailor v. Salvation Army, 51 F.3d at 685.  See Dykstra v. United States Bureau of Prisons, 140 F.3d 791, 795-97 (8th Cir. 1998) (no claim under the FTCA for BOP's

40

alleged negligence in failing to protect an inmate from assault by another inmate because decisions whether to place an inmate in protective custody is the exercise of a discretionary function); Calderon, 123 F.3d at 949-51 (no claim under the FTCA based on the BOP's alleged negligence in failing to protect an inmate from attack by another inmate because decision whether to take disciplinary action against other inmate was the exercise of a discretionary function); Bailor, 51 F.3d at 685 (no claim under the FTCA for negligent placement and supervision of inmate where inmate was placed in a halfway house, but later fled from the halfway house, and assaulted/raped a civilian); Hylin v. United States, 755 F.2d 551, 553 (7th Cir. 1985)(discretionary function exception barred negligence claim against federal mine inspectors after death of mineworker from electrocution who came into contact with defective electrical device located in a mine, because enforcement activities of the Mine Enforcement and Safety Administration are protected by discretional function exception to FTCA liability).

The specific determination of how many officers to employ at any given housing unit at any particular time of day is left to the discretion of the Warden of each institution.  The determination as to what duties to assign to each officer on duty is also a discretionary matter left to the warden and supervisory staff at each prison depending upon the particular needs of the prison.  See **Document 6.**

It is well-settled that determinations regarding staffing patterns and movement of inmates during emergency situations are grounded in the policy of preserving "internal order and discipline and maintain[ing] institutional security." Whitley v. Albers, 475 U.S. 312, 321 (1986). Thus, "neither judge nor jury [should] freely substitute their judgment for that of officials who have made a considered choice." Id.

### F. Alternatively, Punitive Damages Are Barred Under the FTCA.

The Federal Tort Claims Act bars punitive damages. It provides:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, **but shall not be liable for interest prior to judgment or for punitive damages.**

28 U.S.C. § 2674 (emphasis added).

This provision has been recognized by courts as barring the award of punitive damages in cases filed under the FTCA in cases where death was not caused. Barnes v. United States, 685 F.2d 66, 68-69 (3d Cir. 1982). See generally, Massachusetts Bonding & Insurance Co. v. United States, 352 U.S. 128, 77 S.Ct. 186, 1 L.Ed.2d 189 (1956); Smith v. United States, 587 F.2d 1013, 1016 (3d Cir. 1978).

Therefore, because punitive damages are barred under the Federal Tort Claims Act, Plaintiff's request for punitive damages should be denied.

42

G.    **The Individual Defendants Should Be Dismissed From This Civil Action, Because United States Employees in Their Official Capacities Have Not Waived Sovereign Immunity From Suit Under the Federal Tort Claims Act**.

A civil action filed under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2672 et seq., is a suit against the United States.  The FTCA is a limited waiver of sovereign immunity of the United States of America.  United States v. Orleans, 452 U.S. 807 (1976).  As sovereign, the United States is immune from suit except as it consents to be sued, and the terms of its consent, as set forth by Congress, define the limits of the federal courts' subject matter jurisdiction to decide suits brought against it.  Honda v. Clark, 386 U.S. 484 (1967); United States v. Sherwood, 312 U.S. 584 (1941).  The FTCA does not create any substantive causes of action against the United States; rather, it establishes a procedure for remedy.  Richards v. United States, 369 U.S. 1 (1969); Dalhite v. United States, 346 U.S. 15 (1953); Feres v. United States, 240 U.S. 135 (1950).

Under the FTCA, the United States is liable for personal injury caused by the negligent or wrongful acts or omissions of a government employee acting within the scope of his/her office or employment.  28 U.S.C. § 2674; 28 U.S.C. § 1346(b).  See generally, Carlson v. Green, 446 U.S. 14 (1980); Logue v. United States, 412 U.S. 521 (1973); United States v. Muniz, 374 U.S. 150 (1963); Feres v. United States, 240 U.S. 135 (1950).

43

Therefore, because the FTCA is a limited waiver of sovereign immunity which extends to the United States but not to its employees in their official capacities, the Federal Bureau of Prisons and the individual defendants should be dismissed.

**H.** **Plaintiff Failed to Establish That Staff at FCI McKean Failed to Protect Him From Danger, Because the Act of His Assailants Was an Unforeseeable Intervening and Superceding Act**.

Under Pennsylvania law, in order for a party to establish a cause of action for negligence, a party must aver the following four elements:  (1) a duty or standard of care; (2) a breach thereof; (3) proximate causation [and] (4) actual damages.  E.g., Carlotti v. Employees of General Electric Federal Credit Union, 717 A.2d 564, 567 (Pa.Super. 1998).  Because the damages in this case were caused by the unforeseeable acts of third parties, Plaintiff has failed to establish proximate causation.

The duty of care owed by the Bureau of Prisons to federal prisoners is governed by 18 U.S.C. § 4042, independent of any inconsistent state rule.  United States v. Muniz, 374 U.S. 150, 164 (1963).  See Flechsig v. United States, 991 F.2d 300, 303-04 (6th Cir. 1993).  The statute provides, in pertinent part:

> The Bureau of Prisons, under the direction of the Attorney General, shall –
>
> > (2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise;

44

> (3) provide for the protection, instruction,
> and discipline of all persons charged with or
> convicted of offenses against the United
> States;

18 U.S.C. §4042(a)(2) and (a)(3).

Section 4042 has been interpreted as requiring the Bureau to exercise "ordinary diligence." <u>Cowart v. United States</u>, 617 F.2d 112, 116 (5th Cir. 1980), <u>cert.</u> <u>denied</u>, 449 U.S. 903 (1980); <u>Herrington v. United States</u>, No. 83 Civ. 8007, 1984 WL 1279, at *2 (S.D.N.Y. Nov. 28, 1984) (under 18 U.S.C. § 4042, government owes federal prisoners a duty of "ordinary care").

Although there was a duty to exercise ordinary care on the part of the Bureau of Prisons, there is no evidence showing a breach of this duty.  The evidence indicates that prior to the incident in question, staff at FCI McKean had no reason to believe that Plaintiff was at an increased risk of being assaulted by other inmates.  <u>See</u> **Document 1c, Document 2e.** Moreover, the evidence shows that after the assault, Plaintiff failed to report the assault or injury to staff.  <u>See</u> **Document 2e.**

Even assuming <u>arguendo</u> that there was a duty to protect Plaintiff from unreported and unknown dangers, the evidence shows that the assault was proximately caused by the act of Plaintiff's assailants by beating Plaintiff, and not from any negligence on the part of Bureau of Prisons staff.  <u>See</u> **Document 2e, Document 2c.**

45

The test for proximate causation is whether a defendant's acts or omissions were a substantial factor in bringing about a plaintiff's harm.  Blum v. Merrell Dow Pharmaceuticals Inc., 705 A.2d 1314, 1316 (Pa.Super. 1997).  "[A] cause can be found to be substantial so long as it is significant or recognizable; [thus,] it need not be quantified as considerable or large."  Jeter v. Owens-Corning Fiberglas Corp., 716 A.2d 633, 636 (Pa. Super. 1998).  Factors which a court may use to determine whether an act is a substantial factor in causing a plaintiff's harm include: (1) the number of other factors which contribute in producing the harm and extent of the effect which they have in producing it, (2) whether the defendant's conduct created a force or series of forces that are in continuous and active operation up to the time of the harm, or has created a situation that is harmless unless acted upon by other forces for which the actor is not responsible, and (3) lapses of time.  Restatement (Second) of Torts § 433; Talarico v. Bonham, 168 Pa. Commw. 467, 474-75, 650 A.2d 1192, 1195-96 (1994).

Here, the Bureau's duty to exercise ordinary care must be viewed in light of the fact that at the time of the assault, there were numerous inmates in the housing unit.  Particularly, at 8:30 p.m., the time the assault occurred, the officer assigned to Plaintiff's unit, was at the door of the housing unit supervising inmate ingress during the final inmate movement of

46

the day.  See **Document 7**, Declaration of Brian Weseman.  There is no evidence that the acts or omissions by staff present in Plaintiff's housing unit created a force or series of forces which inevitably led to the assault.  See **Document 2e**.  Thus, the evidence lacks any indication that the acts or omission of Bureau of Prisons staff proximately caused Plaintiff's injuries.

Finally, even assuming arguendo a court were to find negligence on the part of Bureau staff, the unforseeable intervening and superceding act of Plaintiff's assailants in beating Plaintiff severed any causal link between the hypothetical negligence and the injury to Plaintiff.

A superseding cause is defined as an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.  Restatement 2d Torts § 440; Frey v. Smith, 454 Pa.Super. 242, 685 A.2d 169 (1996), appeal denied, 549 Pa. 437, 700 A.2d 441; Corbett v. Weisband, 380 Pa.Super 292, 551 A.2d 1059, 1073 (1988).  An intervening criminal act of a third person may indeed be a superseding cause of injury, but not where the criminal act is reasonably foreseeable.  Mike v. Borough of Aliquippa, 279 Pa.Super. 382, 393-394, 421 A.2d 251, 257 (1980); Restatement 2d Torts, §§ 448, 449; Klages v. General Ordinance Equipment Corp., 240 Pa.Super. 356, 367 N.2d 304 (1976).  Cf. McCoy v. Penn Fruit Co., 245 Pa.Super. 251, 369 A.2d 389 (1976).

The Supreme Court of Pennsylvania applies Section 448 of the
Restatement 2d Torts, which is entitled "Intentionally Tortious
or Criminal Acts Done Under Opportunity Afforded by Actor's
Negligence." Randall, Inc. v. AFA Protective Systems, Inc., 516
F.Supp. 1122, 1125 (E.D.Pa. 1981). Section 448 provides:

> The act of a third person in committing an intentional
> tort or crime is a superseding cause of harm to another
> resulting therefrom, although the actor's negligent
> conduct created a situation which afforded an
> opportunity to the third person to commit such a tort
> or crime, unless the actor at the time of his negligent
> conduct realized or should have realized the likelihood
> that such a situation might be created, and that a
> third person might avail himself of the opportunity to
> commit such a tort or crime.

The Supreme Court of Pennsylvania has held that the jury
must determine whether the defendant, at the time of his
negligent conduct realized or should have realized the likelihood
that his negligent conduct created a situation which afforded an
opportunity to a third person to commit a crime, and that a third
person might avail himself of the opportunity to commit a crime.
Ford v. Jeffries, 474 Pa. 588, 379 A.2d 111 (1977).

Yet, here no jury determination needs to be made because
there is no evidence that Bureau of Prisons staff committed **any**
negligent acts or omissions which in turn created an opportunity
for Plaintiff's assailants to injure him.

Therefore, because Plaintiff has failed to establish that
prison staff negligently failed to protect him from his inmate
assailants, this portion of the complaint should also be
dismissed.

I.    **Plaintiff Was Not Subjected to Medical Malpractice**.

With respect to Plaintiff's allegations of medical malpractice by Bureau of Prisons medical staff, he has failed to allege facts establishing a causal link between the medical care provided by Bureau of Prisons staff, the alleged injuries and future injuries caused from the assault.

To sustain a cause of action for medical malpractice, a plaintiff must establish the following five elements: (1) the physician owed a duty to the patient; (2) the physician breached that duty; (3) the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient; and (4) the damages suffered by the patient were a direct result of that harm.  Moreover, the patient must offer an expert witness who will testify to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered.  Rauch v. Mike-Meyer, 783 A.2d 815, 824 (Pa.Super 1987); Wolloch v. Aiken, 756 A.2d 5, 14-15 (Pa.Super. 2000).  *Compare* Hightower-Warren v. Silk, 548 Pa. 459, 463 n.1, 698 A.2d 52, 54 n.1 (Pa. 1997)(expert medical testimony is not required if a matter is so simple or the lack of skill or care is so obvious as to be within a lay person's range of experience and comprehension).

49

In this case, the evidence shows Plaintiff was assaulted by two inmates.  The evidence shows that Plaintiff did not report the assault to staff.  Indeed, the evidence shows that the assault came to staff's attention nearly two days after the assault, only after a correctional officer asked Plaintiff to remove a blanket he had over his face.  See **Document 2a**.  The evidence shows that after Plaintiff removed the blanket, and the officer saw the injuries to Plaintiff's face, Plaintiff stated he was injured when a weight fell on him in the weight room.  Id.

Within 35 minutes of observing the injuries to Plaintiff's face, Plaintiff was escorted to the Health Services Unit (HSU). See **Document 2b**.  While in the HSU, a Physician's Assistant (PA) thoroughly examined Plaintiff and diagramed his injuries.  See **Document 2c**.  The evidence shows that Plaintiff reported to the PA left face and eye pain secondary to an assault by two inmates. He denied losing consciousness.  He complained of minor pain, swelling and abrasions of the right chest and back, right upper extremity and both hands.  He reported episodic nose bleeding during the first 24 hours after the assault.  He also complained of resolving or decreasing parasthesia of the left face and maxilla dentura.  He denied dizziness, vision loss, loss of consciousness, or hearing loss.  Id.  During a physical examination, Plaintiff's injuries were checked, and a Snelling visual acuity examination was conducted.  It was noted that

Plaintiff's vision was 20/25 in both eyes.  Id.  There is no indication Plaintiff reported double vision and blurred vision. Id.  The physical examination did not indicate Plaintiff's left eye was off-centered.  Id.

The evidence reveals medical staff made rounds through the Special Housing Unit (SHU) twice each day; however, Plaintiff did not report any medical issues to staff during these rounds.  See **Document 4a; Document 5.**

The evidence shows that on March 9, 2004, nearly two weeks after the assault, medical staff stopped at Plaintiff's cell, not upon Plaintiff's request, but upon the request of an Associate Warden.  See **Document 4a**, at p. 43.  During this visit, Plaintiff was belligerent, and he failed to identify any medical issues or indicate he was experiencing pain.  Id.

The evidence shows that Plaintiff received medical attention on March 11, 2004.  See **Document 4a**, at pp. 40-41.  At that time, Plaintiff reported he suffered contusions about his face, back and arm incident to an assault by two inmates on February 27, 2004.  He stated his left eye was punched and was sore but the soreness cleared up after the injury.  Plaintiff stated that in the previous five days, the eye became sore again, with crusting of the lower lid and weeping and redness.  He denied photophobia (light sensitivity), but his eye became slightly sore when he looked extremely down.  Id., at p. 40.  Notably absent from

51

Plaintiff's complaints were reports of double vision or blurred vision.  The Medical Officer examined him, and reported he looked well.  His pupils were equal, and reacted to light and accommodation.  His extra ocular movements were full on both sides.  He noted Plaintiff's conjunctiva was slightly red on the left side with an abrasion on the lower eye lid.  Plaintiff's left eye was watery.  He noted Plaintiff's visual acuity was 20/30 in both eyes.  It was noted that an examination using Flurosine contrast stain showed no defect of the left cornea.  Notably missing from the Medical Officer's observation was any indication the left eye was off center.  Plaintiff was assessed with abraded lower lid of the left eye.  Id., at pp. 40-41.  Plaintiff was provided with eye drops, and an optometry consultation was ordered.  Id., at p. 41.

The evidence shows that Plaintiff did not request medical attention again while he was in SHU.  On March 25, 2004, a notation was entered in Plaintiff's record that due to his discharge from SHU the previous day, he was not available for SHU sick call.  It was noted that Plaintiff could seek further medical attention by reporting for sick call.  Id., at p. 38.

On March 31, 2004, he was seen by the contract optometrist.  The optometrist's examination suggested Plaintiff had superior orbital muscle entrapment after the February 27, 2004 assault.  Based upon the optometrist's report, the Medical Officer talked

with the contract ophthalmologist, who recommended a CAT scan of the orbits, including coronal views and an ophthalmology consultation one week later. Id., at pp. 38, 143.

April 1, 2004 was the first date Plaintiff reported double vision. Specifically, Plaintiff reported, "When I look up, I see double." Id., at p. 37. The Medical Officer noted Plaintiff appeared okay generally during extra ocular motion testing. He noted Plaintiff could not look up above the rest point with his left eye. His lateral eye movements appeared to be okay. Tenderness was noted at the upper aspect of the orbital rim. Id., at p. 37. The Medical Officer assessed Plaintiff with probable left superior orbital muscle entrapment. Plaintiff was educated regarding the treatment plan. Id., at p. 37.

On April 9, 2004, CAT scans of his orbits were conducted. The radiologist's report indicated irregularity involving the floor of the orbit; however, this injury appeared old. No obvious muscle entrapment was noted at that time. The radiologist's impression was old fracture involving the floor of the orbit. Id., at p. 89.

On April 15, 2004, Plaintiff was seen by the contract ophthalmologist. The ophthalmologist noted Plaintiff's vision was 20/100 in the right eye and 20/200 in the left eye, and this could be corrected with eyeglasses. His eyes were well-aligned straight ahead. However, with an upward gaze, the left eye did

not elevate or look as far up as the right eye.  The
ophthalmologist did not see any signs that the left eye was
protruding further out or recessed into the eye more than the
right.  The retina was normal.  The ophthalmologist noted the CAT
scan report suggested there was some scarring of the floor of the
orbit with possible adhesions to the inferior rectus muscle.  He
noted that it was common ophthalmological practice to wait at
least two weeks to see if the area would heal on its own, thus
resolving the muscle entrapment.  It was noted Plaintiff was
about six to eight weeks post injury and was complaining of
symptoms.  He opined that because Plaintiff was well-aligned at
near, it would be better to take a conservative approach.  He
suggested obtaining a second opinion from an orbital plastic
specialist who deals with these issues on a regular basis.  Id.,
at pp. 30, 140-141.

    On April 30, 2004, Plaintiff was seen by a second
ophthalmologist.  The second ophthalmologist reported Plaintiff's
left eye was quite functional with a degree of impairment.  He
recommended that the eye be re-checked three months post injury.
If diplopia was evident straight ahead, he would recommend a
surgical repair.  A follow-up with the second ophthalmologist was
scheduled for six weeks.  Id., at p. 28.

    On May 6, 2004, Plaintiff reported he felt somewhat better.
He stated he had pain looking up and to the right.  He stated he

54

felt like he was making progress.  He did much better, upon
examination, of extraocular movements with elevation of the left
eye.  He had slight diplopia when looking up to the right.  He
reported the prescription eyeglasses were okay.  He was assessed
with improving functional left inferior rectus and healing blow-
out fracture of the left orbit.  He was educated regarding using
eyeglasses.  Id., at p. 29.

On June 4, 2004, Plaintiff stated he still saw double when
he looked up and to the right side.  He complained of pain in his
left eye and nasal areas.  His field of motion was checked.  It
was not obvious that the right eye was lacking exact coordination
with the left eye.  It appeared Plaintiff was getting better, but
Plaintiff still complained of diplopia in certain situations.
Id., at p. 26.

On June 9, 2004, Plaintiff was seen by the second
ophthalmologist.  The ophthalmologist reported that Plaintiff
still had entrapment.  He could not look up with his left eye
without experiencing a form of diplopia that gave him extreme
imbalance.  Plaintiff stated he did not think he could function
this way.  The ophthalmologist recommended a repair of the
fracture to release the entrapment under general anesthesia.  He
indicated the side effect of this repair would be possible
diplopia in down gaze.  Id., at p. 137.

After his arrival at FCI Elkton, on September 20, 2004, Plaintiff complained of mild pain with decreased superior movement of his left eye, and pain with lateral movement. Id., at p. 13. The June 16, 2004 ophthalmologist's letter was reviewed with respect to possible surgical release of entrapment. It was noted the Ophthalmologist could not guarantee Plaintiff would not get decreased vision or diplopia. The CAT scan of April 4, 2004 was also reviewed. Follow-up CAT scans were ordered. Id., at p. 13.

On January 19, 2005, Plaintiff was seen in the General Chronic Care Clinic at FCI Elkton. He reported a history of diplopia, dizziness, headaches, and left eye muscle entrapment due to an assault at FCI McKean. An eye examination was given, and an ophthalmology consultation was scheduled. Id., at pp. 8-9.

On March 28, 2005, CAT scans of Plaintiff's orbits were conducted. The radiologist's report indicated there appeared to be a fracture involving the left orbital floor. Absence of bone was noted involving the posterior aspect of the orbital floor and lateral aspect. The inferior rectus muscle extended to the defect but did not definitely appear to be entrapped. Minimal left maxillary sinus mucosal thickening was present. The radiologist suspected this was not an acute fracture. Minimal, if any, soft tissue swelling was evident. The impression of the

56

radiologist was bony defect involving the posterior lateral aspect of the left orbital floor.  He suspected this represented an area of previous fracture.  A small amount of orbital fat extended into this area.  The left inferior rectus muscle extended to the defect but not through the defect.  It did not appear to be entrapped.  <u>Id</u>., at p. 87.

On April 6, 2005, Plaintiff was seen in the Chronic Care Clinic at FCI Elkton.  He complained of pain in the left eye when looking up or to the side.  He also complained of numbness to the left side of the face, without dizziness or drooling.  On examination, his pupils were equal in reaction to light. Diplopia was noted when he looked up.  He was assessed with diplopia, history of orbit fracture, and folliculitis.  <u>Id</u>., at pp. 6-7.

On May 18, 2005, Plaintiff was seen on follow-up of the CAT scan of his left eye.  He stated he was still experiencing gaze problems and pain.  On examination, his vision was stable.  He was assessed with left orbital fracture with mild entrapment of the left inferior rectus muscle.  His case was referred to the Utilization Review Committee (URC) for approval of an ophthalmologist consultation and surgical consultation.  <u>Id</u>., at p. 5.

On June 8, 2005, the URC approved the ophthalmologist's referral.  <u>Id</u>., at p. 180.

On July 6, 2005, Plaintiff was seen in the Chronic Care Clinic.  He complained of left eye pain when he looked up.  He also had some swelling of the upper lid of his right eye.  He complained of allergies for two weeks.  On examination, no redness was observed in his right eye.  His pupil was round and reactive to light.  Mild swelling of the upper lid was evident. No swelling or redness was observed at the left eye.  Tenderness was reported in the medial side of the upper side of the orbit. He was assessed with history of orbit fracture and diplopia.  He was informed of the approval to send him to an Ophthalmologist for a surgical consultation.  Id., at p. 5.

On August 11, 2005, Plaintiff was scheduled to be taken to the office of the contract ophthalmologist for an evaluation. However, he refused to have the wrist restraints and black box applied to permit staff to take him on this trip.  Plaintiff was issued a medical refusal form to signify he was refusing medical treatment; however, he refused to sign the form.  Id., at p. 180.

On August 11, 2005, he was taken to the HSU and seen by medical staff because he refused to submit to the application of arm restraints.  It was noted he continued to have a decrease of vision and left eye pain.  He also complained of diplopia when reading.  On examination, his visual acuity was 20/25 in his left eye and 20/20 in his right eye.  The eye fundoscopic examination was negative.  Slight decreased lateral range of motion was observed.  He was assessed with history of left orbit fracture,

orbital muscle entrapment and left eye pain.  It was noted
Plaintiff refused to sign the medical refusal form.  He was
offered pain medications, but he refused.  He stated that Motrin
and Naprosen did not help.  His vision acuity was good.  He was
told that if he needed pain medication, he should tell the nurse
during sick call.  Id., at p. 2.

On August 11, 2005, he was taken to the HSU with complaints
of wrist pain.  He stated, "the restraints were excessively tight
and my wrists hurt.  It hurt my ankles too."  On examination, no
swelling or redness were noted.  He had full range of motion of
both wrists.  Distal circulation was in tact.  No visible or
palpable abnormalities were observed.  No swelling or redness
were observed at his ankles.  He had full range of motion of is
ankles.  No visible abnormalities were noted.  Id., at p. 173.

From the outset, the evidence shows that Plaintiff did not
report the assault to staff.  See **Document 2a.**  Indeed, it was
staff at FCI McKean who first observed the injury to Plaintiff's
face, and sent him to Health Services for medical attention.  See
**Document 2b** and **Document 2c.**  While in Health Services, Plaintiff
did not report double vision or blurred vision.  He did not
request pain medication either.  See **Document 2c.**

The evidence shows that after his medical assessment, he was
placed in the SHU, pending investigation into the assault.  See
**Document 3a.**  The evidence shows that each day, numerous staff,

including medical staff, made rounds through the SHU.  See **Document 5**.  That Plaintiff did not seek medical attention or notify non-medical staff to obtain medical attention for nearly a week and a half after he was injured is not negligence on the part of government employees.

The evidence shows that on March 9, 2004, medical staff, at the request of an Associate Warden, went to Plaintiff's cell, and he was abusive and belligerent.  Plaintiff did not report double vision, blurry vision pain, or off-centered eyes.  See **Document 4a**, at p. 43.

On March 11, 2004, the date the Medical Officer received a written request for medical attention from Plaintiff, Plaintiff received prompt and thorough medical attention.  Id., at pp. 40-41.  From March 11, 2004, through the date Plaintiff filed the civil action in this case, he received medical attention each time he reported issues regarding his eyes.  Id., at pp. 1-39. While he was incarcerated at FCI McKean, he received a CAT scan and he was sent to see an optometrist and two different ophthalmologists.  Id., at pp. 28, 30-32, 34, 36, 88-89, 137-145. The medical records indicate that after Plaintiff was transferred to FCI Elkton, he continued to receive medical care for his eye each time he reported to Health Service personnel.  Id., at pp. 1-14.

60

The evidence shows that Plaintiff's treatment by Bureau of Prisons medical staff was thorough and prudent.  See **Document 4a.** Any delay in medical treatment was due to Plaintiff's own failure to report his injury to staff, and to cover-up the injury while staff were present.  See **Document 2a.**  Similarly, the evidence shows that Plaintiff did not report to medical staff double vision or blurry vision.  See **Document 2c.**  There is no evidence that he requested pain medication, or that medical staff denied him pain medication.  See **Document 4a.**

Therefore, because the evidence fails to support Plaintiff's claim he was subjected to medical malpractice, any liability for Plaintiff's second cause of action may not be imposed against the United States.

J.    **Even Assuming *Arguendo* That Bureau Staff Negligently Failed to Protect Plaintiff and Subjected Plaintiff to Medical Malpractice, Any Recovery by Plaintiff in This Case Should Be Barred by His Own Comparative Negligence**.

The Pennsylvania Comparative Negligence statute provides as follows:

(a) **General rule.**-In all actions brought to recover damages for negligence resulting in death or injury to person or property, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recover by the plaintiff or his legal representative where such negligence was not greater than the causal negligence of the defendant or defendants against whom recovery is sought but any damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff.

61

42 Pa.C.S.A. § 7102.  Under this statute, a plaintiff is barred
from recovery if his/her negligence is greater than that of the
defendant.  See Terwilliger v. Kitchen, 781 A.2d 1201 (Pa.Super
2001).

In this case, Plaintiff should be barred from recovery,
because his failure to report to staff that he was at risk of
harm by other inmates and by failing to report physical injuries
to staff immediately after the incident is greater than the
negligence, if any, of the prison medical staff.

Although Plaintiff maintains staff at FCI McKean failed to
exercise adequate measures to protect him from his assailants,
the record shows there was no reason for staff to know that
Plaintiff was at risk of being assaulted or harmed by another
inmate.  If anyone should have known he was in danger of an
assault, it was Plaintiff.  However, he failed to alert staff to
any potential risk of violence from other inmates.  See **Document
2e.**

To the extent Plaintiff alleges his injuries were
exacerbated by a delay or lack of medical care, the evidence
shows clearly that after the assault, Plaintiff failed to report
to staff.  See **Document 2a, Document 2b, Document 2c.**  Even after
staff were alerted to the assault, Plaintiff was unhelpful in
identifying for staff what the extent of his medical needs were.
Specifically when asked to state how he was injured, Plaintiff

reported he was injured when a weight fell on him.  See **Document
2a.**  The evidence shows that while in the SHU, Plaintiff failed
to request medical help for nearly two weeks.  See and **Document
5, Document 4a**, at pp. 40-43.  The record shows that prior to
Plaintiff's first request for medical assistance, a Physician's
Assistant went to his cell, and Plaintiff was verbally abusive
and belligerent.  Id., at p. 43.  Moreover, the record shows that
more recently, Plaintiff caused staff to cancel a medical trip to
an ophthalmologist, due to his refusal to permit staff to apply
restraints to his writs.  Id., at p. 2.

The medical record is replete with evidence that Plaintiff
was seen by Bureau of Prisons Health Services staff numerous
times after they became aware of the assault.  Id., at pp. 1-43.

Therefore, because Plaintiff's negligence in failing to
either alert staff that he was in danger of being harmed by other
inmates and/or in failing to report the assault to staff, was
greater than any negligence, if any, on the part of Bureau of
Prisons staff, Plaintiff should be barred from any recovery in
this case.

K.    **Plaintiff's Third Cause of Action Should Be
      Dismissed Due to Plaintiff's Failure to
      Exhaust This Allegation Prior to Filing the
      Lawsuit.**

In Plaintiff's Third Cause of action, he alleges he was
subjected to retaliation for filing an administrative tort claim

against government officials.  This cause of action should be
dismissed, because Plaintiff failed to exhaust his available
remedies under the Federal Tort Claims Act prior to filing this
civil action.  <u>See</u> **Document 1**.

> The Federal Tort Claims Act (FTCA) provides:
>
> (a)   An action shall not be instituted upon a claim
> against the United States for money damages for injury
> or loss of property or personal injury or death caused
> by the negligent or wrongful act or omission of any
> employee of the Government while acting within the
> scope of his office or employment, unless the claimant
> shall have first presented the claim to the appropriate
> Federal agency **and his claims shall have been finally
> denied by the agency in writing** ...

28 U.S.C. § 2675(a) (emphasis added).

Under the FTCA, filing a tort claim with the administrative
agency is a jurisdictional prerequisite.  <u>Rosario v. American
Export-Isbrandtsen Lines, Inc.</u>, 531 F.2d 1227 (3d Cir. 1976),
<u>cert. denied</u>, 429 U.S. 857 (1977); <u>Commonwealth of Pennsylvania
v. Nat'l Ass'n of Flood Insurers</u>, 520 F.2d 11 (3d Cir. 1975);
<u>Bialowas v. United States</u>, 443 F.2d 1047 (3d Cir. 1971); <u>Cooper
v. Perkiomen Airways, Ltd.</u>, 526 F.Supp. 1086 (E.D.Pa. 1981).

With respect to alleged retaliation by staff for his filing
of an administrative tort claim, Plaintiff failed to file an
administrative tort claim pursuant to 28 U.S.C. § 2675(a).  <u>See</u>
**Document 1**, at ¶ 4.

The filing of a complaint which includes the allegation of
retaliation in United States District Court does not excuse the

requirement of prior exhaustion of administrative tort remedies under 28 U.S.C. §2675.  <u>Henderson v. United States</u>, 785 F.2d 121, 125 (4th Cir. 1986); <u>Kelley v. United States</u>, 792 F.Supp. 793, 795 (M.D. Fla. 1992); <u>Flickinger v. United States</u>, 523 F.Supp. 1372 (W.D.Pa. 1981).  <u>See</u> <u>Rosario v. American Export-Isbrandtsen Lines, Inc.</u>, 531 F.2d 1227, 1234 n.19 (3d Cir. 1976), <u>cert. denied</u>, 429 U.S. 857 (1977).  Therefore, because Plaintiff failed to exhaust the issue of retaliation prior to filing this law suit, Plaintiff's Third Cause of Action should be dismissed with prejudice for lack of subject matter jurisdiction.

## VII. <u>CONCLUSION</u>

Based upon the above, the Federal Defendants request that their accompanying Motion to Dismiss, or in the Alternative, for Summary Judgment be granted in favor of them and against the Plaintiff.

Respectfully submitted,

MARY BETH BUCHANAN
UNITED STATES ATTORNEY


<u>s/Paul E. Skirtich</u>
PAUL E. SKIRTICH
Assistant United States Attorney
Western District of Pennsylvania
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
(412) 894-7418
PA ID No. 30440

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the within Defendants' Memorandum of Law in Support of Motion to Dismiss, or in the Alternative, for Summary Judgment was electronically filed and/or served by postage-paid U.S. Mail on this 4th day of January, 2006, to and upon the following:

```
Darryl Orrin Baker
Plaintiff Pro Se
Reg. No. 19613-039
FCI Lisbon
Post Office Box 10
Lisbon, OH 44432-0010
```

s/Paul E. Skirtich
PAUL E. SKIRTICH
Assistant U.S. Attorney